**The CADLE COMPANY, Appellant**

v.

**Bonnie C. MANGAN, Trustee Appellee**

**The Cadle Company, and D.A.N. Venture, A Limited Partnership Appellants**

v.

**Bonnie C. Mangan, Trustee, Charles Atwood Flanagan and John C. Flanagan Appellees**

**Nos. 3:03cv1358(JBA), 3:03cv1359(JBA).**

United States District Court, D. Connecticut.

Sept. 30, 2004.

Edward C. Taiman, Jr., Sabia & Hartley, LLC Hartford, CT, for Appellants.

Joseph L. Rini, Berchem, Moses & Devlin, P.C., Milford, CT, Douglas S. Skalka, Neubert, Pepe & Monteith, New Haven, CT, for Appellee.

**Ruling on Cadle and D.A.N.'s Appeal and Trustee's Cross–Appeal from Decision of Bankruptcy Court**

ARTERTON, District Judge.

This appeal is consolidated from two related bankruptcy adversary proceedings. For the reasons discussed below, the bankruptcy court's decisions are affirmed.

## I. Background

On February 17, 1999, Charles Flanagan filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. Flanagan's case was converted from Chapter 11 to Chapter 7, and Bonnie C. Mangan was appointed as trustee of Flanagan's bankruptcy estate.

Mangan brought an adversary proceeding pursuant to 11 U.S.C. § 547 seeking to avoid and recover an alleged preferential transfer made by Flanagan to the appellant, the Cadle Company ("Cadle"), to satisfy a judgment that Cadle had obtained against Flanagan ("Preference Action"). In a decision issued on May 22, 2003, the bankruptcy court ruled in favor of the trustee and avoided the transfer. The bankruptcy court upheld its original decision on reconsideration, in a modified opinion issued on July 3, 2003.

Cadle, along with D.A.N. Joint Venture, another creditor of Flanagan, brought a second adversary proceeding in which they sought imposition of a constructive trust and a declaratory judgment that they possessed superior rights in certain equity securities that were owned by Flanagan prior to his bankruptcy filing ("Constructive Trust Action"). The bankruptcy court denied the requested relief in a May 22, 2003 decision, and upon reconsideration, upheld its original decision without modification.

Both the preference action and the constructive trust action were based on the following undisputed facts. Prior to the filing of the bankruptcy petition, on March 20, 1997, Cadle obtained a judgment against Flanagan in the U.S. District Court, District of Connecticut, in the amount of $90,747.87. Cadle is also in possession of a July 29, 1996 judgment against Flanagan in the amount of $128,217.02, arising out of an action in the Connecticut Superior Court. In a second Superior Court action, D.A.N. obtained a judgment against Flanagan on April 15, 1998 in the amount of $321,546.27. D.A.N. also had an unliquidated claim against Flanagan for $899,620.67.

At the time of these judgments, Flanagan owned 50% equity interests in Thompson & Peck., Inc. and Flanagan/Prymus Insurance Group, Inc., which were valued well in excess of $100,000.00. While Flanagan had been in possession of these stock certificates, in September 1997, he transferred possession of the stock to Socrates Babacus, as security for loans Babacus made to Flanagan in the aggregate amount of $85,000.

In an effort to locate assets with which to satisfy its federal judgment against Flanagan, Cadle subpoenaed Flanagan to appear for an examination of the judgment debtor on March 9, 1998, and to produce, *inter alia,* "all documents in his custody, possession or control relating to or evidencing any interest which [Flanagan] may hold in Thompson & Peck." Subpoena Duces Tecum of The Cadle Company directed to Charles A. Flanagan, Feb. 18, 1998, *The Cadle Company v. Charles A. Flanagan,* No. 3:96cv2648 (AVC), United States District Court [Doc. # 4, Ex. 19] at 5. Flanagan appeared for the hearing but failed to produce any documents evidencing his stock assets.

On March 12, 1998, Cadle moved pursuant to Fed.R.Civ.P. 69(a) and Conn. Gen. Stat. § 52–356b for a Turnover Order "commanding the Defendant/Judgment Debtor, Charles A. Flanagan, and/or Thompson & Peck, Inc., to turn over all evidence of Charles A. Flanagan's ownership and/or interest in Thompson & Peck, Inc. and its related entity(ies), including any and all stock certificates in his/its possession, under his/its control and/or available to him/it or in which he had an inter-

est as of the date the Property Execution in this matter was served." Motion for Turnover Order, Mar. 12, 1998, *The Cadle Company v. Charles A. Flanagan*, No. 3:96cv2648 (AVC), United States District Court [Doc. # 4, Ex. 10]. Cadle's motion was granted in the absence of objection on April 13, 1998. Flanagan subsequently moved for and was granted reconsideration, but the substantive relief he requested was denied by order dated September 23, 1998. After Flanagan failed to comply with the turnover order, he was ordered to show cause why he should not be held in contempt, and a hearing was conducted on November 16, 1998. At the conclusion of the hearing, the court found that Flanagan "has willfully and intentionally not complied with the order as previously entered by the Court," and ordered "him committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying fully with the order." Transcript of Hearing re: Order to Show Cause, Nov. 16, 1998, *The Cadle Company v. Charles A. Flanagan*, No. 3:96cv2648 (AVC), United States District Court [Doc. # 4, Ex. 15] at 51–52. The court stayed the execution of the order and scheduled a hearing in the next week to review what documents had been produced by that time.

Flanagan's father subsequently loaned Flanagan the sum of $100,222.87 so that Flanagan could fully satisfy the Judgment, delivering a personal check to Flanagan on November 18, 1998. Flanagan gave his stock certificates to his father as collateral for this loan, arranging for Babacus to relinquish possession of the stock certificates and to deliver them to his father's home.

Having received funds sufficient to satisfy the judgment Cadle had obtained against Flanagan, Flanagan's attorney attempted to tender the sum of $99,542.87 to Cadle, but was refused. On November 20, 1998, the funds were deposited into the Registry of the District Court, and Cadle received the payment after the court granted its motion for payment of monies deposited into Court on December 3, 1998.

Meanwhile, efforts to execute on the judgments in the superior court actions were underway. On November 18, 1998, D.A.N. filed its judgment lien with the Connecticut Secretary of State's office in connection with the April 15, 1998 judgment. On November 20, 1998 the Superior Court ordered Flanagan "to immediately turn over all evidence of interest of the Defendant, Charles A. Flanagan, in and to Thompson & Peck, Inc., including all stock certificates and all documents and communications concerning any and all transfers and/or hypothecation of the ownership interest of Charles A. Flanagan at any time during the previous four years, to the Plaintiff as of the date of the property execution." Flanagan's father, John Flanagan, who was at that point in possession of the stock certificates, was served with a property execution on December 1, 1998. John Flanagan did not turn over the stock certificates pursuant to the property execution, obtained an order quashing the subpoena that had been served on him to turn over the stock, and filed motions with the Superior Court to vacate the plaintiff's execution and for determination of interest in the stock, claiming a superior interest in the stock at issue.

In the proceedings before the bankruptcy court, Cadle and D.A.N. argued that had Flanagan complied with the turnover orders issued by the District Court and the Connecticut Superior Court, then Cadle and D.A.N. would have secured their judgments by serving executions upon the sheriff in possession of the stock, thereby causing a lien to attach in an amount equal to the judgment debts, and allowing the

stock to be sold for their benefit. Cadle and D.A.N. sought imposition of a constructive trust to restore them to the secured position they would have been in absent Flanagan's misconduct. In the Preference Action, the trustee sought to avoid the $99,542.87 payment that Flanagan made to Cadle as a preferential transfer, which is defined under 11 U.S.C. § 547(b) as "any transfer of an interest of the debtor in property—(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made— (A) on or within 90 days before the date of the filing of the petition; . . . and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title . . ." 11 U.S.C. § 547 (1999). Cadle did not dispute that Flanagan's payment satisfied the first four statutory provisions. Cadle argued, however, that because a constructive trust would deem Cadle to have constructive possession of the stock certificates and a fully secured lien on the stock more than 90 days prior to Flanagan's filing for bankruptcy, Flanagan's subsequent payment of $99,542.87 to Cadle could not be said to have improved Cadle's position,[1] and the transfer of stock would then be outside the trustee's avoidance powers under 11 U.S.C. § 547.[2]

The bankruptcy court ruled in favor of the trustee in both the Preference Action and the Constructive Trust Action, finding that Flanagan was not under an obligation to turn over the actual stock certificates, that Cadle's mere possession of the stock certificates would not have perfected its security interest, and that imposition of a constructive trust was not appropriate. The bankruptcy court concluded:

> Cadle enjoyed no vested property interest in the Stock prior to Flanagan's post-judgment misconduct, only an expectation of the potential fruits of execution thereon. Cadle has not cited, and this Court has not independently located, any judicial authority which has impressed a constructive trust upon property in which the purported beneficiary possessed only an expectation interest. In addition, Cadle's case lacks an element of causation; it simply cannot say, "but for Flanagan's misconduct, we would have obtained an unavoidable interest in the Stock." Even if Flanagan had not concealed information about the Stock, it is possible—indeed probable— that any execution activity by Cadle with respect to the Stock would have been negated in the context of an accelerated bankruptcy filing by him."

Modified Memorandum of Decision on Complaint for Avoidance of Preferential Transfer [Doc. # 4, Ex. 33] at 13.

---

1. As the bankruptcy court explained, had Cadle had a fully secured position, then Flanagan's $99,542.87 payment would not have given Cadle more than it would receive in bankruptcy because "even if the Payment had not been made, Cadle's secured position would have 'ridden through' the Debtor's bankruptcy filing, eventually resulting in full payment of the Judgment." Modified Memorandum of Decision on Complaint for Avoidance of Preferential Transfer [Doc. # 4, Ex. 33] at 9.

2. In the Preference Action, Cadle and D.A.N. argued in the alternative that the filing of a judgment lien certificate with the Connecticut Secretary of State fully secured the judgment. The bankruptcy court rejected this argument on grounds that the property description contained in the certificate was insufficient to perfect a security interest in the stock. *See* Modified Memorandum of Decision on Complaint for Avoidance of Preferential Transfer [Doc. # 4, Ex. 33] at 15. Appellants do not challenge this conclusion on appeal.

The bankruptcy court also considered Cadle's earmarking defense, based on the fact that Flanagan paid his $99,542.87 judgment debt to Cadle using funds he borrowed from his father. While as a general rule a debtor's payment of a debt with borrowed funds constitutes a transfer within the meaning of Section 547(b), an exception is "where the borrowed funds have been specifically earmarked by the lender for payment to a designated creditor," in which case there is "no transfer of property of the debtor even if the funds pass through the debtor's hands in getting to the selected creditor." *Id.* at 16 (quoting *In re Montgomery*, 983 F.2d 1389, 1395 (6th Cir.1993)). The bankruptcy court found that the funds at issue were "earmarked" because Flanagan's father lent him the funds for the specific and sole purpose of satisfying the judgment purging the contempt found by the District Court's order and staying out of prison. The bankruptcy court concluded, however, that "even though the transaction fits the earmarking defense insofar as it replaced one creditor (Cadle) with another (John Flanagan), the substitution of a *secured* for an *unsecured* obligation attenuates that defense because, and to the extent, it caused a diminution to Flanagan's personal estate, i.e. a reduction in the amount of property available to unsecured creditors." *Id.* at 19. The bankruptcy court found that John Flanagan's security interest in the stock, obtained as collateral for his loan to his son, supplanted Babacus's security interest in the stock, which had been obtained as collateral for an $85,000 loan to Flanagan, and that therefore "the net diminution of Flanagan's estate attributable to the Payment was $14,542.87—the amount of the Payment ($99,542.87) minus the amount of the Babacus Obligation ($85,000.00)." *Id.* at 20. As a result, the bankruptcy court entered judgment in favor of the trustee to avoid the transfer, but

authorized its recovery from Cadle only to the extent of $14,542.87.

## II. Standard

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that "[o]n an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992). The bankruptcy court's conclusions of law, however, are reviewed *de novo*. *See In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir. 1992).

## III. Discussion

### A. Cadle and D.A.N.'s Appeal

Appellants have raised five principal issues on appeal: (1) whether the bankruptcy court erred when it ruled that the subpoena and turnover order required only that Flanagan turn over photocopies of the stock certificates for discovery purposes, not the original stock certificates; (2) whether the bankruptcy court erred when it ruled that Cadle's possession of the stock pursuant to a lawful execution would not have vested its judgment with a perfected secured status; (3) whether the bankruptcy court erred when it refused to impose a constructive trust on grounds that Cadle had not established that but for

Flanagan's misconduct he would have secured status because any earlier execution on the stock likely would have been negated by an earlier bankruptcy filing; (4) whether the bankruptcy court erred in concluding that Cadle and DAN were not beneficiaries of a constructive trust because they enjoyed only an expectation interest in the stock. If this Court should conclude that imposition of a constructive trust is appropriate and that Cadle thus had secured status, Cadle asks for a review of the bankruptcy court's decision that as a result of the transfer at issue, Flanagan's bankruptcy estate suffered a diminution of $14,542.87.

Because it is undisputed that appellants never took possession of Flanagan's stock certificates prior to Flanagan's filing for bankruptcy, the issues in this appeal can be narrowed to one core question: whether imposition of a constructive trust is appropriate on the facts of this case. As this Court answers this question in the negative, it is unnecessary to consider the bankruptcy court's conclusion about the scope of the turnover order, nor is it necessary to reach Cadle's objections to the bankruptcy court's limitation on its earmarking defense.

■ The problem begins with Appellants' premise that imposition of a constructive trust would restore them to the position they would have been in but for Flanagan's misconduct. While this premise accurately describes the equitable nature of the remedy, it understates the true force of a constructive trust. Under Connecticut law, which governs here,[3] a constructive trust arises "contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *Zack v. Guzauskas,* 171 Conn. 98, 103, 368 A.2d 193 (1976). The bankruptcy court found, and it remains unchallenged on this appeal, that Flanagan engaged in concealment of his stock, and that Flanagan's misconduct prevented Cadle and D.A.N. from perfecting their security interest in the stock in accordance with Connecticut's post-judgment remedy procedures, by executing a levy on the stock or by forcing the sale of the stock in order to obtain their share of the proceeds in satisfaction of the judgment. *See* Conn. Gen.Stat. § 52–356a. That is to say, Appellants were entitled to but were prevented by Flanagan from obtaining a judicial lien on Flanagan's stock. *See* 11 U.S.C. §§ 101(36), (37) (defining judicial lien as "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding;" and defining lien as "charge against or interest in property to secure payment of a debt or performance of an obligation").

■ A constructive trust, however, is designed to retain the property itself for the beneficiary, not to create as a trust a mere lien on the property. *See* Dan B. Dobbs, 2 *Law of Remedies,* (2d ed.1993) at 601 (distinguishing constructive trusts from equitable liens, in that "[w]here the constructive trust gives complete title to the plaintiff, the equitable lien only gives

---

**3.** "The existence and nature of a debtor's interest, and correspondingly the estate's interest, in property is determined by state law. One must look to state law, therefore, to determine whether to impose a constructive trust on property within the debtor's possession." *Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88, 93 (2d Cir.1989).

him a security interest in the property, which he can then use to satisfy a money claim.") Appellants have not claimed, and there is no basis for finding, that they were entitled to an ownership interest in the Thompson & Peck business, which the stock represented, or more importantly, that Flanagan was *not* entitled to a "legal right to [the] property," *Zack*, 171 Conn. at 103, 368 A.2d 193. Their claim is that Flanagan was not entitled to retain possession or to conceal who had possession of the stock in light of the court-issued turnover orders. The stock, which appears to have been the only property of value that they as judgment creditors could go after, was to be levied upon in order to satisfy their judgments.

▆▆ In the Constructive Trust Action, Cadle and D.A.N. argued broadly that a constructive trust would give them a security interest in the stock sufficient to satisfy all of their judgments against Flanagan. In effect, they argued that the stock would be "both secured in favor of a creditor and also excluded from property of the estate." The Cadle Company and D.A.N. Joint Venture, A Limited Partnership, Memorandum of Law in Support of Motion for Summary Judgment [Doc. # 6] at 19. The majority rule, endorsed by the Second Circuit, is indeed that property held in constructive trust does not constitute property of the estate. As the Second Circuit explained, "[w]here the debtor's conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property

subject to the same restrictions ... Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.'" *Howard's Appliance*, 874 F.2d at 93 (citations and internal quotation marks omitted). Such a consequence follows from 11 U.S.C. § 541(d), which provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." Because constructive trusts at common law are deemed to come into existence at the time the events giving rise to the finding of wrongdoing occurred, the Second Circuit, following the reasoning of other circuits, has concluded that constructive trusts attach prior to the filing of bankruptcy petition and are not subject to the trustee's avoidance powers. *See Howard's Appliance*, 874 F.2d at 95 (citing *In re Quality Holstein Leasing*, 752 F.2d 1009, 1013–14 (5th Cir.1985); *In re General Coffee Corp.*, 828 F.2d 699, 704–07 (11th Cir.1987)).[4]

Here, however, appellants were never entitled to own Flanagan's stock, just to obtain possession of the stock as one step toward execution of a levy on it, pursuant to which a sale would be held and the sale proceeds distributed to Cadle and D.A.N. Thus, Cadle and D.A.N.'s argument that the bankruptcy court could somehow protect the entire value of the stock necessary to satisfy their judgments against Flanagan, by taking it outside the property of

---

4. Not all circuits agree. For example, the Sixth Circuit in *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir.1994), held that "[b]ecause a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing'

defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an 'equitable interest' in the debtor's estate existing prepetition, excluded from the estate under § 541(d).''

the estate, is inconsistent with the nature of constructive trusts. *Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88 (2d Cir.1989), does not suggest the contrary. In *Howard's Appliance*, the security agreement between Sanyo, as creditor, and Howard, gave "Sanyo a security interest in all of the goods possessed or acquired by Howard that were manufactured or sold by, or acquired from, Sanyo." *Id.* at 90. Sanyo, as the manufacturer or dealer of the home appliances at issue, thus had a claim to an equitable ownership interest in the appliances themselves, an interest unlike that of a judgment creditor.

Further, appellants' claim of entitlement to a constructive trust ignores completely Connecticut's post-judgment remedy statute. To the extent that Cadle would have gained any interest in the stock had Flanagan complied with the turnover order, such interests were unperfected and contingent on then completing a series of procedural hurdles.

■ First, Cadle would not have accomplished the perfection of a judicial lien by gaining a possession of the stock in compliance with the turnover order.[5] Under Conn. Gen.Stat. § 42a–8–112(a), "[t]he interest of a debtor in a certificated security may be reached by a creditor only by actual seizure of the security certificate by the officer making the attachment or levy, except as otherwise provided in subsection (d) of this section." Subsection (d) provides that "[t]he interest of a debtor in a certificated security for which the certificate is in the possession of a secured party, may be reached by a creditor by legal process upon the secured party." Under subsection (e), "A creditor whose debtor is the owner of a certificated security ... is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security ... or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process."

The procedure for executing the seizure of the certificates securities is set forth in Conn. Gen.Stat. § 52–356a, which provides that a judgment creditor may file an application stating that the judgment remains unsatisfied, and after the expiration of any stay of enforcement or the expiration of any right of appeal, "the clerk of the court in which the money judgment was rendered shall issue an execution," which "shall be directed to any levying officer." Conn. Gen.Stat. § 52–356a(a)(1). The levying officer would then personally serve a copy of the execution on the judgment debtor, and "[o]n the failure of the judgment debtor to make immediate payment, the levying officer shall levy on the nonexempt personal property of the judgment debtor" by taking the property into the levying officer's possession. § 52–356a(a)(4). If the property is in the possession of a third person, "the levying officer shall serve that person with two copies of the execution, required notices, and

---

5. *Hastings v. Furr*, 177 B.R. 723 (S.D.Fla. 1995), on which Appellants rely, is not to the contrary. *Hastings* examined Florida's UCC-based statute and concluded, "[c]ertified securities must be actually seized to perfect a creditor's lien against a debtor's certificated securities. Although the judgment creditors served the writ of execution upon the sheriff ..., the sheriff was unable to seize the certificated shares as required ... Therefore, the judgment creditors failed to obtain a perfected judgment lien." *Id.* at 727. Here, the turnover order Cadle obtained directed Flanagan to turn over evidence of his interests in Thompson & Peck to Cadle, not to a levying officer, and thus would not have effectuated a seizure of the property. It would have instead been at best a step toward achieving a seizure by a levying officer.

claim forms," and that third person would then mail a copy of the execution to the judgment debtor and "withhold delivery of the property or payment of the debt due to the levying officer or any other person for twenty days." § 52–356a(a)(4)(C). "On expiration of the twenty days, the third person shall forthwith deliver the property or pay the debt to the levying officer..." *Id.*

Where, however, a third party claims that the execution will prejudice his superior interests in the property, the third party may file a claim for determination of interests. *See* Conn. Gen.Stat. § 52–356c(a) ("Where a dispute exists between the judgment debtor or judgment creditor and a third person concerning an interest in personal property sought to be levied on, or where a third person claims that the execution will prejudice his superior interests therein, the judgment creditor or third person may, within twenty days of service of the execution or upon application by the judgment creditor for a turnover order, make a claim for determination of interests pursuant to this section.").

Once the judgment debtor's interest in property is levied on pursuant to an execution, the statute provides that it shall be sold by the levying officer, but that "the sale shall be subject to, and shall not affect, any secured interests, including any such liens, that are senior in right to the execution." § 52–356a(b)(1). Thus, any sale of the stock would not have affected any secured interests that Babacus held in the stock.[6] Finally, the statute carefully delineates how the proceeds from the sale are to be distributed.

> All amounts received from the sale, and all other money received, shall be distributed subject to the supervision of the court according to the following priorities: (1) To all reasonable and necessary costs of the sale; (2) to other legal costs of levy including the levying officer's fees of five per cent of the amount realized; (3) to payment of the judgment creditor pursuant to the judgment under which the sale was held or the money received; (4) to payment of any subordinate secured parties or lienors who make a written demand to the levying officer prior to the sale, according to their respective interests, and to any other judgment creditors presenting an execution to the levying officer, in the order of presentation; and (5) to payment to the judgment debtor.

§ 52–356a(d).

■ As this review of Connecticut's post-judgment remedy statute makes clear, Cadle and D.A.N.'s interests in the stock were subject to a series of contingencies, in which other creditors with secured interests in the stock were entitled to prevent execution or gain priority status over Appellants. The distinction here—that the turnover over did not entitle Appellants to own Flanagan's stock, just to gain possession as an aid to execution of a levy upon it—is one that Appellants appear to have blurred. This distinction, however, leads to the inexorable conclusion that the right to have a demand satisfied from specific property does not give rise to a constructive trust.

The narrower argument that Appellants make is that had they received a perfected judicial lien absent Flanagan's misconduct, then, for preference purposes, the perfection of the lien itself would be unavoidable as a transfer, as it would have come into existence prior to the 90–day preference period, and Flanagan's subsequent pay-

---

**6.** Had Flanagan complied with the turnover order, then he would not have had occasion to request that Babacus transfer possession of the stock to John Flanagan, and thus Babacus would have retained a secured interest in the stock.

ment of $99,542.87 would be unavoidable because it would not have improved Cadle's position. As discussed above, however, under Connecticut's post-judgment remedy law, Cadle's possession would not itself perfect the lien. Even assuming that Appellants would be entitled to some kind of equitable remedy that would restore to them the equivalent of the perfected judgment lien that they arguably would have had absent Flanagan's concealment of the stock certificates, the Court concludes that the Bankruptcy Code does not permit such remedy to relate back in order to prevent avoidance of the preferential transfer.

A equitable remedy that would give Cadle a perfected lienholder status might be best described as an "equitable lien." *See Restatement (First) of Restitution* § 161 (1937)("Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien

arises."). The Bankruptcy Code does not expressly recognize equitable liens. Instead, its subjects include "statutory liens,"[7] "judicial liens,"[8] and "security interests."[9] The parties have not addressed whether equitable liens are enforceable under the Bankruptcy Code, whether it is appropriate to deem a lien perfected and secure for preference purposes under section 547, and whether enforcement of an equitable lien in bankruptcy relates back to the time of wrongdoing. In examining these issues, the analysis set forth in *Norton Bankruptcy Law and Practice 2d* is persuasive:

> [I]n an analogous context, involving statutory liens, specific provision is made exempting these liens from avoidance under preference law.[10] The absence of the special exemption for equitable liens suggests that no special accommodation was intended. This conclusion is further supported by the fact that Code § 546(b)[11], which preserves relation-

---

7. A statutory lien is defined as a "lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." 11 U.S.C. § 101(53).

8. A judicial lien is defined as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." 11 U.S.C. § 101(36).

9. A security interest is defined as a "lien created by agreement." 11 U.S.C. § 101(51).

10. 11 U.S.C. § 547(c)(6) provides that the trustee may not avoid a transfer "that is the fixing of a statutory lien that is not avoidable under section 545 of this title."

11. Section 546(b) provides that "[t]he rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any

generally applicable law that—(A) permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or (B) provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation." "The purpose of section 546(b) is to 'protect, in spite of the surprise intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection.'" Collier on Bankruptcy ¶ 546.03[1] at 546–20 (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 86–87 (1978), 1978 U.S.Code Cong. & Admin.News 1978, 5872–73). Because § 546(b) does not apply to preferential transfers under § 547(b), any relation-back rule for equitable liens under Connecticut law would not permit recognition under § 547(b) of the perfection of Appellants' interests in Flanagan's stock more than 90 days prior to the bankruptcy filing as an equitable remedy.

back features of state law, expressly excludes Code § 547 from coverage. Under Code § 547, a transfer is deemed to occur only when the interest becomes protected against specified third parties, no relation-back principle is recognized and, in fact, Code § 547(e) specifically rejects a similar concept in connection with security interests in after-acquired property.

The appropriate conclusion is that, for purposes of Code § 547, an equitable lien is transferred when steps to declare or enforce it are taken and without the benefit of any relation-back principle. As a result, if the lien is enforced within the relevant preference period, and other elements of a preference are present, it will typically constitute an avoidable transfer for an antecedent debt.

*Norton Bankruptcy Law and Practice 2d* § 57:29.

▉ Thus, in light of the care with which the Bankruptcy Code describes the circumstances in which certain liens would be recognized as perfected under a relation-back principle, the absence of any statutory language on equitable liens and on relating back for purposes of preferential transfers under § 547 the perfection of a lien by a imposition of post-petition equitable remedy, this Court agrees and adopts the Norton conclusion that post-petition recognition of an equitable lien would not relate back, and thus the trustee may avoid the preferential transfer.

As this Court concludes that appellants are not entitled to imposition of a constructive trust, and that an equitable lien, even if enforceable, would not relate back and thus would not support their argument that Flanagan's $99,542.87 payment was not a preferential transfer, the bankruptcy court's decision is affirmed and appellants' appeal is dismissed.

## B. Trustee's Cross–Appeal

The trustee has cross-appealed from the bankruptcy court's partial upholding of Cadle's earmarking defense and finding that the amount of the transfer avoided by the trustee as preferential should be calculated by subtracting the amount the Debtor owed to Socrates Babacus from the amount that Flanagan paid to Cadle. For the reasons discussed below, the bankruptcy court is affirmed.

First, the trustee's argument that Flanagan's payment met all of the requirements for avoidance under Section 547 is beside the point. The earmarking doctrine is well-established as a valid defense where a trustee seeks to avoid a preferential transfer. *See, e.g. In re Montgomery,* 983 F.2d 1389, 1395 (6th Cir.1993) ("[T]here is an important exception to the general rule that the use of borrowed funds to discharge the debt constitutes a transfer of property of the debtor: where the borrowed funds have been specifically earmarked by the lender for payment to a designated creditor, there is held to be no transfer of property of the debtor even if the funds pass through the debtor's hands in getting to the selected creditor."); *In re Kelton Motors, Inc.,* 97 F.3d 22, 28 (2d Cir.1996) ("The earmarking doctrine applies only where a third party lends money to the debtor for the specific purpose of paying a selected creditor.") (citation and internal quotation marks omitted); *In re Bohlen Enterprises, Ltd.,* 859 F.2d 561, 565 (8th Cir.1988) ("The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property' …").

The trustee, relying on district court authority in this Circuit, argues for a stricter interpretation of the earmarking doctrine, in which the defense would be

allowed only if Flanagan lacked all possible control over the borrowed funds. *See Kelton Motors, Inc. v. Bank of Vermont*, 153 B.R. 417, 428 (Bankr.D.Vt.1993) (holding that the earmarking defense should be strictly construed to "cases where the new creditor pays the old creditor directly or where the new creditor and debtor agree in a binding contract that the new loan will be used specifically to pay the old creditor."). As the bankruptcy court noted, however, the Second Circuit did not adopt this holding on appeal, *see In re Kelton Motors, Inc.*, 97 F.3d 22, 28 n. 3 (2d Cir. 1996) (noting that because case was being remanded "we leave to the bankruptcy court in the first instance the question of whether the earmarking doctrine applies"), and the Second Circuit has earlier accepted an earmarking defense on facts similar to those present here, *see Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938) ("[I]f [the Bank] once made it clear that the debtor could use [the credit] only in one way, that was the only way that [it] could use it, and it never enriched the estate.").

The fact that the earmarked funds are placed in the debtor's possession before payment to the old creditor need not affect a finding that the funds are not in the debtor's control. *See Bohlen*, 859 F.2d at 565 (surveying caselaw concluding that "even when the guarantor's new funds are placed in the debtor's possession before payment to the old creditor, they are not within the debtor's 'control.'"). Instead, as the Eighth Circuit set forth in *Bohlen* in a test that has been widely adopted, there are three requirements for a transaction to qualify for the earmarking doctrine: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to

its terms, and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate." *Id.* at 566. The bankruptcy court here made extensive factual findings, fully supported by the record, that John Flanagan, the father of Charles Flanagan, specifically earmarked his loan to his son toward satisfaction of Cadle's judgment, in order to remove the contempt order against his son, and that Flanagan accepted the loan on the condition that the proceeds be used to pay the judgment. Given that Flanagan was under threat of imprisonment if he did not either satisfy the judgment or hand over his stock, the prospect that he would use the funds for some other purpose is unrealistic. The funds were in fact used in the intended manner. Under the circumstances present in this case, use of the earmarking doctrine thus has ample support, and accepting the theoretical possibility that Flanagan could have diverted the money elsewhere would distort the true intent of the parties as found by the bankruptcy court.

The bankruptcy court also determined, however, that the payment "was part of a larger transaction that undermines, to some degree, [Cadle's] earmarking defense." *See* Modified Memorandum of Decision on Complaint for Avoidance of Preferential Transfer [Doc. # 4, Ex. 33] at 19. The full transaction involved John Flanagan's loan to his son, which was *secured* by Flanagan's stock, and which was used to pay off an *unsecured* obligation to Cadle. The stock, in turn, had previously been encumbered by Socrates Babacus's lien to secure his $85,000 loan to Flanagan. The bankruptcy court found that John Flanagan's lien on the stock, which secured his $100,222.87 loan to his son, supplanted Babacus's lien. The bankruptcy court accordingly concluded that "to the extent

that the [John Flanagan loan] encumbered previously unencumbered property of Flanagan to enable to Payment, there is no earmarking defense available to Cadle, and the Payment is voidable and recoverable from it." *Id.* at 19. Subtracting the amount of the Babacus obligation ($85,000.00) from the amount of the payment ($99,542.87), the bankruptcy court found the net diminution of Flanagan's estate attributable to the Payment was $14,542.87, and thus allowed the trustee to avoid the transfer as preferential only to the extent of the $14,542.87.

The trustee has not cited any authority establishing the error in the bankruptcy court's analysis. Given the equitable nature of the earmarking doctrine, and the bankruptcy court's acceptance of the earmarking defense only to the extent it did not result in any diminution of the estate, bankruptcy court did not err in basing its determination on a calculation of the net diminution of Flanagan's property.

Cadle, in its reply, objects to the bankruptcy court's finding that Babacus was a creditor. Flanagan testified before the bankruptcy court that he "guess[ed]" the Babacus Obligation was "upwards of $80 to $85,000.00, approximately." The bankruptcy court found that "[d]espite the imprecision of such unrebutted testimony, this Court finds the amount of that obligation to be $85,000.00," Modified Memorandum of Decision on Complaint for Avoidance of Preferential Transfer [Doc. # 4, Ex. 33] at 4 n. 2, and stated that "[a]lthough the court heard credible testimony regarding a security agreement between Babacus and Flanagan, it did not receive any documentary evidence memorializing such an agreement. However, given Babacus' possession of the Stock, it was not necessary for the security agreement to be in writing." *Id.* at 20. Cadle has pointed to no evidence that would call

these factual findings into question, and accordingly, Cadle's objection is denied.

## IV. Conclusion

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED. The Clerk is directed to close this case.

IT IS SO ORDERED.