479 F.3d 168
 In re BETHLEHEM STEEL CORPORATION.
John P. Supplee, Appellant,
v.
Bethlehem Steel Corporation, Debtor-Appellee.
 Docket No. 06-1478-bk.
 United States Court of Appeals, Second Circuit.
 Argued: January 23, 2007.
 Decided: March 2, 2007.
 
 Douglas L. Furth (Andrea B. Schwartz, on the brief), Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY, for appellant.
 Mark. A. Jacoby, Weil Gotshal & Manges LLP, New York, NY, for debtor-appellee.
 Before KEARSE and SOTOMAYOR, Circuit Judges, and CEDARBAUM, District Judge.*
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Appellant John P. Supplee, whose employment was terminated without cause by debtor-appellee Bethlehem Steel Corporation ("BSC") during the pendency of BSC's Chapter 11 bankruptcy proceedings, asserts that a portion of the early retirement benefits due him under two BSC retirement plans should be recognized as an administrative claim on BSC's estate. Specifically, he contends that the two plans' early retirement penalties, which in his view are waived upon termination in certain circumstances, constitute a severance payment that is entitled to administrative priority under Straus-Duparquet, Inc. v. Local Union No. 3 International Brotherhood of Electrical Workers (In re Straus-Duparquet, Inc.), 386 F.2d 649 (2d Cir.1967). The United States Bankruptcy Court for the Southern District of New York (Lifland, B.J.) denied Supplee's claim for priority payment, and the United States District Court for the Southern District of New York (Daniels, J.) affirmed. We hold that Supplee's claim is not for an administrative expense because it represents a portion of the benefits he accrued over the course of his employment rather than a new benefit earned at termination.
 
 BACKGROUND
 
 2
 Supplee began working for Lukens, Inc. ("Lukens") in 1965, and became an employee of BSC in 1998 when BSC acquired Lukens. Lukens maintained two retirement plans for its management-level employees as a supplement to its primary retirement plan: the Lukens Inc. Supplemental Retirement Plan ("SERP"), adopted on December 28, 1975, and the Lukens Inc. Supplemental Retirement Plan for Lukens Performance Incentive Plan Participants ("LPIP SERP"), adopted on January 1, 1988 (collectively, the "Plans"). Supplee was promoted to a management-level position in February 1985, at which point he became eligible for the SERP, and upon its subsequent adoption, also became eligible for the LPIP SERP. When BSC acquired Lukens, it took over Lukens's obligations under the Plans.
 
 
 3
 Benefits under the SERP and the LPIP SERP vested after an employee accrued five years of management-level service, and were available in full to employees who retired at or after the age of sixty-two. Employees who retired before reaching sixty-two, however, were entitled to receive benefits subject to an early retirement penalty of four percent of their total accrued benefits for each full year by which they were younger than sixty-two, with a proportionate reduction for partial years.
 
 
 4
 Although the Plans were to provide benefits after retirement in the form of monthly payments, they included provisions (the "change-in-control provisions") allowing an employee to receive the present value of accrued benefits under the Plans in a lump sum if any of three events occurred within five years after a "change in control," meaning, essentially, the sale of the company:[1] (1) the employee was terminated other than for cause; (2) the employee resigned because the company withheld compensation or reduced his or her salary, except where all similarly situated employees were likewise affected; or (3) the company terminated the Plans without initiating similar ones. If the employee had not reached age sixty-two at the time one of the three triggering events occurred, his or her lump-sum payment would not be reduced by the four-percent-per-year penalty as it would have in the case of an early retirement.
 
 
 5
 BSC acquired Lukens effective May 29, 1998. On October 15, 2001, BSC filed for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. On April 30, 2003, within five years of BSC's acquisition of Lukens, BSC terminated Supplee's employment as part of its sale of substantially all of its assets to another company. The parties agree that BSC's acquisition of Lukens constituted a change of control under the Plans and BSC appears not to dispute that Supplee's termination triggered the change-in-control provisions. In May, June and July 2003, Supplee received severance payments totaling $80,000 under the Bethlehem Severance Allowance Plan, a severance plan independent of the Plans. On July 3, 2003, Supplee filed a timely claim with the bankruptcy court for his lump-sum retirement-benefits payment, which he calculated as $1,148,685. He asserted that this claim was entitled to priority payment as an administrative expense.[2] Under BSC's reorganization plan, subsequently approved on October 22, 2003, administrative claims would be paid in full.
 
 
 6
 BSC filed an objection, asserting that Supplee's claim was not for an administrative expense of the estate. In a sur-reply to BSC's objection, Supplee conceded that only a portion of his claim was entitled to priority as an administrative expense. Specifically, he asserted that he had an administrative claim for the "waiver" of the four-percent-per-year early retirement penalty he claimed that his termination had occasioned—that is, for the difference between the lump-sum payment he was entitled to receive because of his termination (not reduced by an early retirement penalty) and the present value of the retirement benefits he would have received in monthly installments if he had retired early rather than been fired (reduced by an early retirement penalty). Because Supplee was nearly fifty-eight at the time of his termination, he would have been subject to the early retirement penalty had he retired at the time of his termination. As he explained in his sur-reply, his monthly payment under the Plans had he retired, calculated under the Plans' formulas and offset by the early retirement penalty, would have been $3,753.88, which had a present value of $850,639. As noted, he calculated the lump-sum payment to which he was entitled because of his termination, in contrast, as $1,148,685. In his view, the difference between these two figures, which amounted to $298,046, constituted severance pay and was entitled to priority as an administrative expense under Straus-Duparquet.
 
 
 7
 On December 30, 2003, following a hearing, the bankruptcy court granted BSC's objection to Supplee's claim. It acknowledged that Straus-Duparquet held that severance payments for terminated employees are administrative expenses, but concluded that Supplee was applying Straus-Duparquet too broadly in claiming that the benefits owed him were severance payments. The bankruptcy court reasoned that unlike in Straus-Duparquet, in which the termination itself created the severance payments, Supplee's termination did not create his entitlement to benefits under the Plans, but instead only accelerated the payment of benefits to which he was already entitled. The bankruptcy court also held that because the benefits were payment for past services, they were not severance payments under Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc., 789 F.2d 98 (2d Cir.1986) ("McFarlin's").
 
 
 8
 Supplee appealed the bankruptcy court's order, and in a memorandum decision and order entered March 2, 2006, the district court affirmed. Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 2006 WL 510335 (S.D.N.Y. Mar. 2, 2006). It agreed that Supplee's benefits were not severance payments; unlike severance payments, which are "earned" at the time of dismissal because they compensate employees for the hardship of termination, the benefits Supplee claimed were not intended to compensate him for his job loss, but instead had accrued over the course of his employment. The district court determined Supplee's entitlement to the benefits, therefore, to be accelerated, rather than triggered, by his termination. Moreover, the district court agreed with the bankruptcy court's conclusion that the benefits were not severance pay because they constituted payment for past service. In its view, "[p]ayments under these plans were to supplement appellant['s] retirement income under the qualified pension plan, not to compensate him for his dismissal from his employment."
 
 
 9
 Supplee's timely appeal to this Court followed.
 
 DISCUSSION
 
 10
 In an appeal from a district court's review of a decision of a bankruptcy court, we conduct an independent and plenary review of the bankruptcy court's decision, accepting the bankruptcy court's findings of fact unless they are clearly erroneous and reviewing its conclusions of law de novo. Evans v. Ottimo, 469 F.3d 278, 281 (2d Cir.2006). The bankruptcy court's determination in this case that the payment at issue does not constitute an administrative expense is a conclusion of law.
 
 
 11
 "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." McFarlin's, 789 F.2d at 100. Under the Bankruptcy Code, the administrative expenses of the debtor-in-possession receive highest priority in corporate bankruptcy proceedings. 11 U.S.C. § 507(a)(1). Administrative expenses are defined as "actual, necessary costs and expenses of preserving the estate, including . . . wages, salaries, and commissions for services rendered after the commencement of the case." Id. § 503(b)(1)(A). "[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." McFarlin's, 789 F.2d at 101 (internal quotation marks and citations omitted). "The burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it." Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir.1992); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 482, 489 (Bankr.S.D.N.Y.1991).
 
 
 12
 Reading Straus-Duparquet for the principle that severance payments are administrative expenses, Supplee argues on appeal, as he did before the courts below, that the $298,046 early retirement penalty that was not applied to his lump-sum benefits payment is a severance payment entitled to priority payment. His challenges to the district court's ruling are all variations on the central proposition that the district court failed to recognize that the $298,046 was not a benefit he earned through past service to Lukens and BSC and to which he was previously entitled, but instead represented an additional benefit triggered by his termination. BSC, in turn, argues that the change-in-control provisions were not intended to provide severance payments and that the payments lack the characteristics of typical severance payments.
 
 
 13
 In determining whether a payment incident to termination is entitled to priority as an administrative expense, the key inquiry is whether it represents a new benefit earned at termination or an acceleration of a benefit the employee earned over the course of his or her employment. See Straus-Duparquet, 386 F.2d at 650. Regardless of when the debtor-in-possession becomes obliged to make the payment, it can only be an administrative expense if the debtor received the consideration for the obligation after the commencement of bankruptcy proceedings. See McFarlin's, 789 F.2d at 103. In Straus-Duparquet, we held that the one or two weeks' severance pay claimed under a collective bargaining agreement by employees terminated after the commencement of Chapter 11 proceedings was an administrative expense. 386 F.2d at 650-51. We explained that severance payments are
 
 
 14
 a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense [them] for certain losses attributable to the dismissal.
 
 
 15
 Id. at 651 (internal quotation marks omitted). The severance payment at issue in Straus-Duparquet did not accrue day to day over the course of employment, but rather was triggered by termination, and as such it represented a new benefit payable because of termination rather than one that would be "payable under any circumstances." Id. Because this new benefit was incurred "as an incident of the administration of the bankrupt's estate," it was an administrative expense and "entitled to priority as such an expense." Id.
 
 
 16
 There was nothing talismanic in Straus-Duparquet about the label "severance payment." Rather, as we subsequently reiterated in McFarlin's, the employees in Straus-Duparquet "earned" the severance payment when they were terminated during the pendency of bankruptcy proceedings, because the payment compensated them for the hardships associated with termination. McFarlin's, 789 F.2d at 104. On the other hand, we considered in McFarlin's another type of payment that a debtor-in-possession became obligated to make following the commencement of bankruptcy proceedings—a debtor-in-possession's "withdrawal liability" for ending participation in a multiemployer pension plan[3]—and concluded that it was not an administrative expense. Id. Distinguishing Straus-Duparquet, we explained that whereas severance payments that compensate for the hardships associated with termination are understood to have been earned by the employees by their termination, "[a]n employer's withdrawal liability payment . . . is the means by which the employer funds benefits that his employees have `earned' by their past service and that he would normally finance through continuing contributions to his employees' pension plan." Id. That is, regardless of when the debtor-in-possession's obligation to pay the withdrawal liability arose, the payment represented an accelerated lump-sum contribution toward the benefits its employees had accrued over the course of their prepetition employment. Because the employees' service was the consideration for the withdrawal liability, the obligation to pay was "attributable to the period pre-dating the filing of the Chapter 11 petition" and so was not an administrative expense. Id. at 103.
 
 
 17
 Applying the analysis described in Straus-Duparquet and McFarlin's, we conclude that Supplee has not met his burden of proving that the payment at issue is an administrative expense. As an initial matter, we must determine which payment is the proper focus of our analysis: the amount representing the early retirement penalty or the accrued retirement benefits as a whole. Under the Plans, employees like Supplee, who were terminated without cause within five years of a change in control, were entitled to receive the entirety of their accrued retirement benefits in a lump sum. The sections of the SERP and LPIP SERP providing for this lump-sum payment are distinct from the provisions imposing a penalty for early retirement. Nonetheless, Supplee essentially proposes that he became subject to an early retirement penalty when he was terminated before reaching retirement age, and that the change-in-control provisions then waived the penalty in order to compensate him for termination.
 
 
 18
 Supplee's description mischaracterizes how the change-in-control provisions operate. Because he did not retire, his termination did not trigger the early retirement penalty. Rather, his termination triggered the change-in-control provisions, which allowed him to receive the entirety of his accrued benefits in a lump sum. No penalty was waived as part of this process because no penalty ever became applicable.[4] The Plans' early retirement provisions, by their terms, applied only to employees who retired, and not to employees who received their retirement benefits following termination after a change in control. Thus, the Plans do not provide an additional benefit at termination in the form of a waived early retirement benefit. We therefore conclude that the entirety of the lump-sum retirement benefits to which Supplee became eligible at termination, and not the early retirement penalty, is the proper focus of analysis. We thus consider whether this lump-sum payment was a new benefit earned at termination.
 
 
 19
 The lump-sum payment is analogous to the withdrawal liability discussed in McFarlin's, which we held was not an administrative expense because it was "an employer's accelerated contribution of funds" to support participating employees' vested but not fully funded pension benefits. 789 F.2d at 103. Like the employer's withdrawal liability in McFarlin's, BSC's obligation to pay Supplee this lump sum was triggered because of an action taken following the commencement of bankruptcy proceedings—here, the termination of Supplee's employment without cause within five years of a change in control. Yet the lump-sum payment itself represents the accelerated payment of benefits Supplee accrued over the course of his employment, just as the withdrawal liability in McFarlin's accelerated the employer's funding of benefits the employees had accrued through their years of prepetition service to the debtor. Moreover, unlike the severance payment in Straus-Duparquet, Supplee would eventually have been entitled to receive the benefits at issue here—albeit not in a lump sum—even if he had not been terminated. Therefore, contrary to Supplee's contention, the lump-sum payment to which he is entitled because of his termination does not constitute a new benefit earned at termination.[5]
 
 
 20
 The parties devote a great deal of discussion to whether the payment at issue here constitutes a severance payment. Under the foregoing analysis, however, a payment is not entitled to priority under Straus-Duparquet simply because it is labeled severance. Thus, it is irrelevant whether, as BSC contends, the change-in-control provisions do not operate like a typical severance-pay provision. A payment may be entitled to priority under Straus-Duparquet even if it operates differently from the payment at issue there, if it provides a new benefit at termination that employees would not otherwise receive. The key inquiry is whether the payment is a new benefit earned at termination or instead an acceleration of benefits to which the employee was previously entitled. The former is an administrative expense of the debtor-in-possession, while the latter is not.
 
 
 21
 In sum, Supplee's claim is not entitled to priority as an administrative expense because the Plans do not offer a new benefit earned at termination for employees terminated without cause within five years of a change in control, but instead accelerate the payment of benefits the employees have already accrued over the course of their employment. As such, these payments are not administrative expenses of the debtor-in-possession.
 
 CONCLUSION
 
 22
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Because neither party disputes that BSC's acquisition of Lukens constituted a change of control, the more precise definition of a change in control provided in the Plans is unimportant here
 
 
 [2]
 Supplee also filed a separate general unsecured claim for $799,358 that is not the subject of this appeal
 
 
 [3]
 An employer withdrawing from a multiemployer pension plan is required by statute to make a one-time lump-sum payment to the plan to satisfy its pro rata share of the vested but unfunded benefits the plan is obligated to provideMcFarlin's, 789 F.2d at 99; see 29 U.S.C. § 1381.
 
 
 [4]
 Whereas the SERP simply provides that the terminated employee will receive the present value of his or her accrued benefits in a lump sum, the LPIP SERP states that the employee will receive "the present value of his Accrued Benefit, determined by assuming that the Participant is eligible to begin receiving benefits under the [LPIP SERP] as of the Change in Control Payment Date, regardless of his age, and thatno reduction for early commencement is applicable under [the early retirement provision]" (emphasis added). Although this language superficially supports Supplee's contention that at least the LPIP SERP's change-in-control provision "waives" the Plans' early retirement penalties, in our view it merely clarifies that the early retirement penalty is not implicated by the LPIP SERP's change-in-control provision, and does not waive a penalty that would otherwise apply.
 
 
 [5]
 It appears clear that the purpose of the change-in-control provisions was not to offer compensation for the hardships associated with termination. First, as BSC points out, although the change-in-control provisions operate for only five years following a change in control, compensation for the hardships associated with termination would be no less appropriate six or more years after the company was acquired. Second, the provisions are triggered only when an employee is terminated without cause following a change of control; no payment would be available to employees terminated without cause if a change of control had not occurred. BSC argues that the change-in-control provisions were intended to "impose a financial incentive upon an acquirer—for a five year period post-acquisition—both to retain Lukens' senior management employees in equivalent positions and retain the Supplemental Retirement Plans." This reading is supported by the placement of each change-in-control provision in a section labeled "Continuance of Plan," immediately following provisions stating, in pertinent part, that "[i]t is the intent that the obligations of [Lukens] to pay benefits accrued or payable hereunder shall be binding upon any successor corporation or organization." Nonetheless, because we conclude that the benefits payable under the change-in-control provisions are not a new benefit earned at termination, we need not conclusively determine the change-in-control provisions' purpose