04-5638-bk
In Re: Charles Atwood Flanagan

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued September 14, 2006      Decided: October 9, 2007)

Docket Nos. 04-5638-bk(L), 06-0731-bk(XAP)

_____

In Re: Charles Atwood Flanagan

*****************************************************

Cadle Co., D.A.N. Joint Venture, L.P.,

Appellants-Cross-Appellees,

v.

Bonnie C. Mangan, Trustee.  Charles Atwood Flanagan,
John C. Flanagan,

Appellees-Cross-Appellants,

U.S. Trustee,

Trustee.

_____

Before:
CARDAMONE, MINER, and STRAUB,
Circuit Judges.

_____

Appellants the Cadle Company and D.A.N. Joint Venture, L.P. appeal from a September 30, 2004 judgment of the United States District Court for the District of Connecticut (Arterton, J.), affirming the July 3, 2003 decisions of the United States Bankruptcy Court for the District of Connecticut (Dabrowski, B.J.), which denied appellants' request for the imposition of a

constructive trust over certain securities. Appellee-Cross-Appellant Bonnie C. Mangan, trustee, cross-appeals from the same judgment insofar as it found that a payment of $99,542.87 made by the debtor Charles Flanagan to appellants was partially protected from avoidance by the earmarking doctrine.

Affirmed.

_____

EDWARD C. TAIMAN, Jr., Sabia, Taiman, Moskey, Albano & Shea, LLC, Hartford, Connecticut, for Appellants-Cross-Appellees.

JOSEPH L. RINI, New Haven, Connecticut, for Appellee-Cross-Appellant John C. Flanagan.

JAMES C. GRAHAM, Pepe & Hazard, LLP, Hartford, Connecticut, for Appellee-Cross-Appellant Bonnie C. Mangan, Trustee.

_____

CARDAMONE, Circuit Judge:

This appeal arises from two separate but related adversary bankruptcy proceedings that we will describe in a moment. Charles A. Flanagan (debtor) filed a petition under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. § 101 et seq., for bankruptcy relief in the United States Bankruptcy Court for the District of Connecticut (Dabrowski, B.J.) on February 17, 1999. While debtor-in-possession under Chapter 11, Flanagan instituted the first adversary proceeding (Preference Action) in the bankruptcy court against Cadle Company to avoid and recover for the bankrupt estate a $99,542.87 payment he had made to Cadle Company. Following the conversion of Flanagan's Chapter 11 case to one under Chapter 7, Bonnie C. Mangan was appointed trustee of Flanagan's bankrupt estate and substituted as party plaintiff in the Preference Action.

Cadle Company and D.A.N. Joint Venture, L.P. (collectively Cadle Creditors or appellants) then brought a second separate adversary proceeding (Constructive Trust Action) seeking a declaratory judgment and the imposition of a constructive trust over certain securities that Flanagan owned prior to the bankruptcy filing. In two memorandum decisions issued on May 22, 2003, the bankruptcy court denied the equitable relief requested by the Cadle Creditors and ruled the trustee could avoid the payment from Flanagan to Cadle only to the extent of $14,542.87. The bankruptcy court went on to hold that the payment was partially protected from avoidance by the earmarking doctrine.

2

Following a motion for reconsideration, the bankruptcy court affirmed its original decisions on July 3, 2003. Both parties appealed. The United States District Court for the District of Connecticut (Arterton, J.) affirmed the decisions of the bankruptcy court on September 30, 2004.

As Sir Walter Scott observed "Oh, what a tangled web we weave, when first we practise to deceive." Marmion, Canto VI, Stanza 17 (1808). Such well describes the circumstances of the debtor's conduct revealed by the record in the appeal before us. Fortunately, these tangled facts were carefully sorted out in the bankruptcy court in its decisions and in the district court's September 30, 2004 decision affirming the judgment of the bankruptcy court. We now in turn affirm the judgment of the district court.

BACKGROUND

The facts of this case were laid out in detail by the district court in Cadle Co. v. Mangan, 316 B.R. 11, 14-17 (D. Conn. 2004). Nonetheless, for purposes of clarity and analysis, we include a summary of those facts relevant to the disposition of this appeal.

Prior to Flanagan's bankruptcy filing of February 17, 1999, the Cadle Creditors obtained several money judgments against Flanagan in federal and state court. Most significant for our purposes is a judgment obtained by Cadle against Flanagan on March 20, 1997 in the United States District Court for the District of Connecticut (Covello, J.) in the amount of $90,747.87

3

(federal judgment). Among Flanagan's assets at the time of the federal judgment was a 50 percent equity interest in Thompson & Peck, Inc. and Flanagan/Prymus Insurance Group, Inc. (collectively Thompson & Peck), valued in excess of $100,000. Flanagan had possession of the Thompson & Peck stock certificates at the time of the federal judgment in March 1997. In September 1997 he transferred the certificates to Socrates Babacas as security for loans made by Babacas to him in the amount of $85,000 (Babacas loan).

Cadle's attempts to locate assets with which to satisfy its federal judgment focused principally upon Flanagan's equity interest in Thompson & Peck. In March 1998 Cadle subpoenaed Flanagan to appear before Judge Covello for an examination of the debtor and for Flanagan to produce, inter alia, "[a]ll documents and communications related to or evidencing any interest which [Flanagan] may hold in Thompson & Peck, Inc." Flanagan appeared for the hearing but did not produce any documents that would reveal his interest in Thompson & Peck. On March 12, 1998 Cadle made a motion for a turnover order commanding Flanagan to "turn over all evidence of . . . ownership and/or other interest in Thompson & Peck . . . including any and all stock certificates in [his] possession, under [his] control and/or available to [him]." The turnover order was granted by the district court on April 13, 1998 and upheld on reconsideration.

Despite this court order, Flanagan persistently failed to comply with its instructions. Consequently, on November 16, 1998

4

a hearing was held at which Flanagan was ordered to show cause why he should not be held in contempt for his failure to comply with the court's turnover order. At the conclusion of the hearing, Judge Covello found Flanagan had willfully and intentionally not complied with the turnover order and ordered him committed to the Bureau of Prisons until he complied. The execution of the contempt order was stayed and a hearing scheduled a week later to allow Flanagan one final opportunity to comply.

When Flanagan's father, John Flanagan, learned that his son was facing contempt sanctions, he lent him $100,222.87 for the purpose of satisfying the federal judgment (family loan). John Flanagan had never loaned money to his son before and did so on this occasion only to prevent Charles Flanagan from being imprisoned and to protect the family's reputation. The family loan was secured by the debtor's equity interest in Thompson & Peck and Flanagan arranged for Babacas to deliver the stock certificates to his father's home. Immediately upon receipt of the family loan, Flanagan delivered the funds to his lawyer so that the federal judgment could be satisfied. On November 20, 1998 Flanagan's attorney deposited the funds into the registry of the district court and Cadle received payment on December 3, 1998 (Payment).

Following Flanagan's bankruptcy and the filing of the Preference Action to avoid and recover the Payment as a preferential transfer under 11 U.S.C. § 547, the Cadle Creditors

5

mounted a two-pronged defense. In the Preference Action and in the Constructive Trust Action instituted by appellants, the Cadle Creditors sought the imposition of a constructive trust over the Thompson & Peck stock for their benefit. Appellants argued it was solely because of Flanagan's wrongful concealment of his equity interest in Thompson & Peck that they had been unable to execute upon the stock and secure the federal judgment and other judgments they had obtained prior to the 90-day preference period. Thus, they sought the imposition of a constructive trust over the Thompson & Peck stock to restore them to the secured position they would have occupied absent Flanagan's misconduct. The Cadle Creditors asserted the Payment did not improve their position relative to other creditors (as required by 11 U.S.C. § 547(b)(6)) because, due to their constructive possession of the Thompson & Peck stock, the Cadle Creditors possessed a fully secured lien in the stock prior to the preference period.

The second prong of the Cadle Creditors' defense against the Preference Action was their argument that the family loan funds had been earmarked by John Flanagan for the sole and specific purpose of satisfying the federal judgment against his son. Accordingly, they maintained that the family loan funds had never constituted an "interest of the debtor in property" as required by § 547(b).

The bankruptcy court resolved the Preference Action and the Constructive Trust Action in two decisions issued on May 22, 2003. Both decisions were upheld on reconsideration and a

6

modified opinion was issued in the Preference Action on July 3, 2003. In response to Cadle's constructive trust claim, the bankruptcy court found the imposition of a trust inappropriate in the circumstances. It noted the Cadle Creditors possessed "only an expectation of the potential fruits of execution [on the stock]," and concluded that a constructive trust should not be imposed to "protect property rights which may or may not have become vested and indefeasible."

The bankruptcy court also ruled the Payment was partially protected from avoidance by the earmarking doctrine because the family loan was made for the sole and specific purpose of enabling Flanagan to satisfy the federal judgment. But the bankruptcy court further held that "even though the transaction fits the earmarking defense insofar as it replaced one creditor (Cadle) with another ([John] Flanagan), the substitution of a secured for an unsecured obligation attenuates that defense because, and to the extent, it caused a diminution to Flanagan's personal estate." As a consequence, the bankruptcy court entered judgment in favor of the trustee to avoid the transfer but only to the extent of $14,542.87, an amount equal to the difference between the family loan and the Babacas loan whose security interest had been supplanted.

The Preference Action and the Constructive Trust Action were consolidated on appeal to the district court. On September 30, 2004 Judge Arterton of the United States District Court for the District of Connecticut affirmed the decisions of the bankruptcy

7

court.  The Cadle Creditors appealed, and the trustee, Bonnie C. Mangan, together with John and Charles Flanagan (appellees) cross-appealed.

Meanwhile, the Cadle Creditors instituted two additional proceedings against Charles Flanagan:  (1) a civil RICO action in the United States District Court for the District of Connecticut (Covello, J.) alleging, <u>inter alia</u>, fraud and conspiracy in connection with resisting creditors' collection efforts, and (2) an adversary proceeding in bankruptcy court seeking denial of discharge.  In 2004, the discharge action was withdrawn from the bankruptcy court and consolidated with the RICO action in the district court before Judge Covello.

On April 8, 2005 while the instant appeal was pending, the Cadle Creditors and Flanagan entered into a proposed settlement agreement in the consolidated RICO/discharge action.  As part of the proposed settlement, the Cadle Creditors and Flanagan entered into a "Mutual Release of All Claims" (General Release) which stated

> Upon execution of this Release, both Cadle and Flanagan hereby release each other of and from any and all claims, whether now known or unknown, whether now in existence or arising hereafter, which each has or may have against each other from the beginning of time until the date of the execution of this Release.

Judge Covello entered an order approving the proposed settlement on May 5, 2005, and dismissing the RICO/discharge action with prejudice.

8

## DISCUSSION

### I  Jurisdiction

The first issue we address is whether, in light of the General Release, we retain subject matter jurisdiction over that portion of the appeal relating to the Constructive Trust Action. Appellees assert that by executing the General Release the Cadle Creditors relinquished all claims against Flanagan, including claims against Flanagan's bankrupt estate. The trustee thus reasons the Cadle Creditors have extinguished the basis for the relief sought in the Constructive Trust Action, rendering that portion of the appeal moot.

In order for there to be a valid exercise of subject matter jurisdiction, a federal court must have before it an actual controversy at all stages of review, not simply at the time the complaint was filed. Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974). In general, if an event occurs while an appeal is pending that renders it impossible for the court to grant any form of effectual relief to plaintiff, the matter becomes moot and subject matter jurisdiction is lost. Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 69 (2d Cir. 2001); see also Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992). However, when an appellant retains an interest in a case so that a favorable outcome could redound in its favor, the case is not moot. See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 568-72 (1984).

9

The crux of the trustee's contention is that the Cadle Creditors' claims against Flanagan's bankrupt estate became unenforceable when they entered into the post-petition settlement agreement with the debtor that included a mutual general release of all claims. In making this argument, appellees rely on language in § 502(b)(1) of the Bankruptcy Code. That section states a claim is disallowed in bankruptcy to the extent that it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The trustee asserts that § 502(b)(1) should be read to disallow not only claims that are unenforceable against the debtor at the time the bankruptcy petition is filed but also those claims that become unenforceable against the debtor over the course of the bankruptcy and prior to discharge.

We think the trustee's interpretation of § 502(b)(1) is an untenable reading of the statutory text because it ignores the provision's context within the Bankruptcy Code. Section 502(b) instructs the bankruptcy court to "determine the amount of such claim . . . as of the date of the filing of the petition" except to the extent that "such claim is unenforceable against the debtor." 11 U.S.C. § 502(b), (b)(1) (emphasis added). A plain reading of the statute thus suggests that the bankruptcy court should determine whether a creditor's claim is enforceable against the debtor as of the date the bankruptcy petition was filed. Were this Court to adopt the trustee's interpretation of

10

§ 502(b)(1), we would be forced to conclude that all pre-petition unsecured claims are disallowed to the extent they did not represent non-dischargeable debts. For, as the bankruptcy court aptly noted in In re Strangis, 67 B.R. 243 (Bankr. D. Minn. 1986), "[a]bsent a finding of nondischargeability, no such unsecured claim is enforceable post-petition against a debtor and property of a debtor." Id. at 246.

The General Release could not have impacted any claims held by or against Flanagan's bankrupt estate for an additional and related reason. Flanagan simply did not have the authority to settle any claims against the bankrupt estate. It is well established that once a trustee is appointed, a debtor loses all authority to litigate any claim for or against the estate. As noted in Collier on Bankruptcy

> The trustee, as representative of the estate, has the exclusive capacity to sue and be sued on behalf of the estate, and is charged by law with representing the interest of the estate against third parties claiming adversely to it. . . .
>
> . . . . After appointment of a trustee, a debtor no longer has standing to pursue a cause of action that existed at the time the order for relief was entered. Only the trustee has the authority and discretion to prosecute, defend and settle, as appropriate in its judgment, such a cause of action.

3 Collier on Bankruptcy ¶ 323.03, .03[1], at 323-7 to -9 (Alan N. Resnick et al. eds., rev. 15th ed. 2007); see also 10 Collier on Bankruptcy ¶ 6009.03, at 6009-3 to -6.1.

11

Here, not only was the trustee not a party to the General Release, but there is no indication the bankruptcy court was ever presented with a motion to settle, compromise, disallow, or otherwise dismiss the Cadle Creditors' claims. See Fed. Bankr. R. 9019 ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."); 10 Collier on Bankruptcy ¶ 9019.01, at 9019-2 (noting that any "settlement must be approved by the court"). While Flanagan may have had the authority to settle civil claims that arose against him after his bankruptcy filing, he had no authority to settle claims against the bankrupt estate.

Having established that the bases for the relief sought by the Cadle Creditors in the Constructive Trust Action have not been extinguished, and that a favorable result could redound in their favor, we conclude those claims are not moot. Hence, we retain subject matter jurisdiction to review them.

II   Standard of Review

In an appeal from a district court's review of a bankruptcy court's decision, we conduct an independent examination of the bankruptcy court's decision. Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 479 F.3d 167, 172 (2d Cir. 2007). The bankruptcy court's factual findings will be upheld unless clearly erroneous, and its legal conclusions are reviewed de novo. Id. The ultimate determination of whether or not to impose an equitable remedy -- such as a constructive trust or an equitable lien -- is reviewed for abuse of discretion. See

12

_Adelphia Bus. Solutions, Inc. v. Abnos_, 482 F.3d 602, 607 (2d Cir. 2007) (bankruptcy court's decision whether to exercise its equitable authority is reviewed only for abuse of discretion); see also _Burkhart Grob Luft und Raumfahrt GmbH v. E-Systems, Inc._, 257 F.3d 461, 469 (5th Cir. 2001) ("Because a constructive trust is an equitable remedy, the decision whether to impose it is entrusted to the discretion of the district court, and we review the district court's decision only for an abuse of discretion."). However, legal determinations upon which the dispensation of equitable relief may depend are reviewed _de novo_. See _Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)_, 377 F.3d 209, 213 (2d Cir. 2004) (reviewing _de novo_ the legal conclusion as to whether a party has been unjustly enriched).

III  General Law on Transfer Avoidance

Pursuant to § 547(b) of the Bankruptcy Code, a trustee in bankruptcy may avoid certain transfers if the following criteria are met:

> (1) the transfer is of an interest of the debtor in property;
> (2) to or for the benefit of a creditor;
> (3) on account of an antecedent debt;
> (4) made while the debtor was insolvent;
> (5) within 90 days of bankruptcy or within a year of bankruptcy if the creditor was an insider;
> (6) and the transfer enabled the creditor to receive more than it would have received in a chapter 7 liquidation had the transfer not taken place.

13

11 U.S.C. § 547(b). The burden of proof to establish each of these elements by a preponderance of the evidence rests on the trustee in bankruptcy. Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 34 (2d Cir. 1996). The Cadle Creditors do not contest that the Payment was made within 90 days of Flanagan's bankruptcy, while he was insolvent, on account of an antecedent debt, and for the benefit of a creditor. It is therefore only the first and sixth of these criteria that are at issue in this appeal.

IV Transfer Improves Cadle Creditors' Position in Bankruptcy

A. The Constructive Trust Claim

Concerning the sixth criterion required by 11 U.S.C. § 547(b), the Cadle Creditors aver that the Payment did not improve their position in bankruptcy. They allege that as a result of their constructive possession of the Thompson & Peck stock, they possessed a fully secured lien in the stock. The imposition of a constructive trust is necessary, they insist, to remedy the harm caused by Flanagan's willful failure to comply with the turnover order, which prevented them from perfecting their judgments more than 90 days prior to the bankruptcy filing. We believe the lower courts' refusal to impose a constructive trust on the Thompson & Peck stock was well founded.

The effect of a constructive trust in bankruptcy is profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, any property that the debtor

14

holds in constructive trust for another is excluded from the estate pursuant to § 541(d), which states

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(a)(1), (d); see also Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88, 93 (2d Cir. 1989). A constructive trust thus places its beneficiary ahead of other creditors with respect to the trust res.

The question of whether the imposition of a constructive trust is appropriate in a particular set of circumstances is governed, in the first instance, by state law. See id.; see also Butner v. United States, 440 U.S. 48, 54-55 (1979). The Supreme Court of Connecticut has stated:

> [A] constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

Wendell Corp. Tr. v. Thurston, 680 A.2d 1314, 1317 (Conn. 1996). It is uncontested that Flanagan wrongfully concealed evidence of his equity interest in Thompson & Peck. While such conduct could

15

potentially give rise to a constructive trust in other circumstances, it did not do so here because the Cadle Creditors would not be the proper beneficiaries of such a trust.

A constructive trust has been imposed most often by Connecticut courts "to restore to the plaintiff property of which he has been unjustly deprived." Cadle Co. v. Gabel, 794 A.2d 1029, 1037 (Conn. App. Ct. 2002) (quoting Restatement (First) of Restitution § 160 cmt. d (1937)); see also Starzec v. Kida, 438 A.2d 1157 (Conn. 1981) (affirming imposition of constructive trust for benefit of testator's children where testator gave property to second wife on condition she devise property to his children); Cohen v. Cohen, 438 A.2d 55 (Conn. 1980) (affirming imposition of constructive trust over condominium property where plaintiff conveyed property to son under oral agreement pursuant to which son was to reconvey property back to plaintiff at her request).

Here, the Cadle Creditors were never entitled to an ownership interest in the Thompson & Peck stock. Rather, under Connecticut's post-judgment remedy statute, the turnover order only entitled appellants to gain possession of the stock as the first of several steps in executing a levy upon it. See Mangan, 316 B.R. at 20-21 (describing and applying to the facts of this case Connecticut's post-judgment remedy statute). As the district court aptly noted:

> [Appellants'] interests in the stock were
> subject to a series of contingencies, in
> which other creditors with secured interests

16

> in the stock were entitled to prevent execution or gain priority status over Appellants. The distinction here -- that the turnover order did not entitle Appellants to own Flanagan's stock, just to gain possession as an aid to execution of a levy upon it -- is one that Appellants appear to have blurred.

Id. at 21. Indeed, once the federal judgment had been satisfied by Flanagan with the family loan funds, Cadle lost any expectation interest in the Thompson & Peck stock it might have once had as a result of the district court's turnover order.

The Cadle Creditors point out Connecticut courts have in some situations imposed a constructive trust when the plaintiff was not entitled to an ownership interest in the trust property and had not suffered a loss commensurate to the benefit received by the defendant. See, e.g., Gabel, 794 A.2d at 1039 (allowing for constructive trust over property in favor of plaintiff unsecured creditor because defendant had been unjustly enriched by sham transactions used to shield property from creditors). In these situations, "the defendant is compelled to surrender the benefit on the ground that he would be unjustly enriched if he were permitted to retain it." Id. at 1037.

However, the argument that Flanagan would be unjustly enriched absent the imposition of a constructive trust is unconvincing when made in the context of a bankruptcy proceeding. See First Cent., 377 F.3d at 218 ("[W]e believe it important to carefully note the difference between constructive trust claims arising in bankruptcy as opposed to those that do not . . . .").

17

It has been observed that the "equities of bankruptcy are not the equities of the common law." XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.), 16 F.3d 1443, 1452 (6th Cir. 1994). This is particularly true in the context of constructive trust law. As discussed above, the effect of a constructive trust in bankruptcy is to take the property out of the debtor's estate and to place the constructive trust claimant ahead of other creditors with respect to the trust res. 11 U.S.C. § 541(a)(1), (d); Howard's Appliance, 874 F.2d at 93. It is therefore not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors. This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code. As a consequence bankruptcy courts have been reluctant, absent a compelling reason, to impose a constructive trust on the property in the estate. See First Cent., 377 F.3d at 217-18 (collecting cases); Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d 426, 436 (5th Cir. 1994); Omegas Group, 16 F.3d at 1452 ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.").

The Cadle Creditors make no argument as to why Flanagan's bankrupt estate or, more to the point, Flanagan's general creditors, would be unjustly enriched by the estate's continued ownership interest in the Thompson & Peck stock. Accordingly, we

18

affirm the bankruptcy court's refusal to impose a constructive trust on the stock.

## B. Availability of an Equitable Lien

In the alternative, the Cadle Creditors declare that an equitable lien should be imposed on the Thompson & Peck stock to the extent of their claims. This point was not raised before the bankruptcy court, but appears to have been prompted by language in the district court's opinion. In noting that the appellants were not claiming they rightfully owned the stock, but only that they were entitled to reach the stock as security for their claims, the district court observed that an "equitable remedy that would give Cadle a perfected lienholder status might be best described as an 'equitable lien.'" Mangan, 316 B.R. at 22. The district court then went on to dismiss the possibility of imposing an equitable lien because it concluded that "an equitable lien, even if enforceable, would not relate back" to before the preference period. Id. at 23.

We generally will not consider arguments raised for the first time on appeal. Universal Church v. Geltzer, 463 F.3d 218, 228 (2d Cir. 2006). We do, however, retain discretion to consider an argument not presented to the trial court in order to prevent a manifest injustice or where the argument presents a question of law and additional factfinding is unnecessary. Id. Because the district court considered the equitable lien issue and because the imposition of an equitable lien on the facts of

19

this case raises only a question of law, we briefly consider the matter.

Connecticut law recognizes the equitable lien remedy. See, e.g., Hansel v. Hartford-Conn. Trust Co., 49 A.2d 666, 673 (Conn. 1946); Bassett v. City Bank & Trust Co. (In re Judd), 165 A. 557, 561-62 (Conn. 1933). The equitable remedy was aptly described by the Connecticut Supreme Court in Hansel

> An equitable lien creates merely a charge upon the property and when the person entitled to it is not in possession of that property, he has no right to obtain possession from another unless by virtue of some authority to do so expressly granted to him; his remedy to enforce the lien is by a proceeding in equity to bring about its sale and the application of the proceeds to the satisfaction of the obligation secured, or, in some other manner, by order of the court, to make the property available for the discharge of that debt.

Hansel, 49 A.2d at 673.

Equitable liens arise in a variety of circumstances. For example, an equitable lien may arise by express or implied-in-fact agreement of the parties. See, e.g., Bassett, 165 A. at 561; see also Dan B. Dobbs, 1 Law of Remedies § 4.3(3), at 601 (2d ed. 1993). Most often, however, equitable liens are imposed to prevent unjust enrichment. See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 262-63 (1999). In this sense, equitable liens and constructive trusts share the same substantive basis; both are remedies in equity to redress unjust enrichment. See Dobbs, supra, § 4.3(3), at 601 ("The [equitable] lien is imposed

20

for reasons that, in principle, are the same as those that warrant the constructive trust . . . .").

The traditional distinction between a constructive trust and an equitable lien is that the beneficiary of a constructive trust receives complete title to the asset whereas the holder of an equitable lien receives only a lien on the asset through which it may satisfy a money claim. See Airwork Corp. v. Markair Express, Inc. (In re Markair, Inc.), 172 B.R. 638, 643 (B.A.P. 9th Cir. 1994); Dobbs, supra, § 4.3(3), at 601. Yet, in some states -- including Connecticut -- there is little practical difference between the two remedies because courts have held that a constructive trust beneficiary does not necessarily obtain a right to possess the trust property, but may only receive a lien on the property equal to the amount of the plaintiff's claim. See Wendell 680 A.2d at 1320 ("To say that the . . . property is subject to a constructive trust in Wendell's favor is not to say that Wendell owns the property. On the contrary, it is to say only that Wendell may seek satisfaction of its debt, and no more, out of that property . . . ."). Thus, in Connecticut, the right to recover under a constructive trust is limited in a similar way as it would be under an equitable lien theory.

The Cadle Creditor's contention that they should receive an equitable lien on the stock fails for the same reason as their constructive trust argument. Both the equitable lien and constructive trust remedies are equitable devices to prevent unjust enrichment. But, as discussed above, appellants have

21

failed to demonstrate how Flanagan's bankrupt estate would be unjustly enriched by its continued ownership interest in the Thompson & Peck stock. Because no equitable lien arises in these circumstances, we need not review the district court's conclusion that, even if an equitable lien did arise, it would not relate back to a time before the preference period.

V   Earmarking Doctrine

In order for a transfer to be avoidable by a trustee in bankruptcy, it must be of "an interest of the debtor in property." 11 U.S.C. § 547(b). The requirement that the transfer be of an interest of the debtor in property is not defined in the Bankruptcy Code and has therefore been left to the courts to interpret. In so doing, courts have crafted a doctrine that has come to be known as the earmarking doctrine.

The earmarking doctrine applies "where a third party lends money to the debtor for the specific purpose of paying a selected creditor." Glinka v. Bank of Vt. (In re Kelton Motors, Inc.), 97 F.3d 22, 28 (2d Cir. 1996). In such situations, the loan funds are said to be "earmarked" and the payment is held not to constitute a voidable preference. McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters.), 859 F.2d 561, 565 (8th Cir. 1988).

Early applications of the earmarking doctrine concerned situations in which the debtor's obligation was secured by a guarantor. See id. Where the guarantor paid the creditor on behalf of a debtor, the courts rejected the proposition that the

22

payment could be avoided by the trustee. Id. The rationale for such an outcome was that the property transferred belonged to the guarantor and thus the transfer of that property in no way diminished the debtor's estate. See Nat'l Bank of Newport, N.Y. v. Nat'l Herkimer County Bank, 225 U.S. 178, 185 (1912) ("Neither directly nor indirectly was this payment to the bank made by the [debtor], and the property of [the debtor] was not thereby depleted."). It is likely that courts were also mindful that the opposite result would have the inequitable effect of forcing the guarantor to pay the same obligation twice. See McCuskey, 859 F.2d at 565.

Today, the earmarking doctrine has been extended beyond the guarantor context and several courts have held that it applies whenever a third party provides funds to the debtor for the express purpose of enabling the debtor to pay a specified creditor, that is substituting a new creditor for an old creditor. See Glinka, 97 F.3d at 28; Adams v. Anderson (In re Superior Stamp & Coin Co.), 223 F.3d 1004, 1008 (9th Cir. 2000); Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.), 986 F.2d 228, 231 (8th Cir. 1993); In re Smith, 966 F.2d 1527, 1533 (7th Cir. 1992); Mandross v. Peoples Banking Co. (In re Hartley), 825 F.2d 1067, 1070 (6th Cir. 1987); Coral Petrol., Inc. v. Banque Paribas-London, 797 F.2d 1351, 1356 (5th Cir. 1986). But see Manchester v. First Bank & Trust Co. (In re Moses), 256 B.R. 641, 646-49 (B.A.P. 10th Cir. 2000) (stating that the earmarking doctrine should not be extended beyond guarantor situations);

23

McCuskey, 859 F.2d at 566 (expressing doubt as to whether earmarking doctrine should be extended beyond guarantor situations but ultimately adopting test that allows for application of earmarking doctrine outside that limited context).

Several formulations have been developed to determine whether the earmarking doctrine applies in a particular case. See Manchester, 256 B.R. at 649-50 (discussing various approaches to application of earmarking doctrine). An oft cited approach is that adopted by the Eighth Circuit in McCuskey. McCuskey held that in order for a transaction to qualify under the earmarking doctrine, three requirements must be satisfied: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate." 859 F.2d at 566; see also Kaler v. Cmty. First Nat'l Bank (In re Heitkamp), 137 F.3d 1087, 1088-89 (8th Cir. 1998) (applying McCuskey formulation). Other courts have focused primarily on whether the debtor lacked control over the funds supplied by the new creditor. See, e.g., Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.), 16 F.3d 313, 316 (9th Cir. 1994); Coral, 797 F.2d at 1358.

We have long recognized the earmarking doctrine, though our early cases did not refer to it by that name. See, e.g., Smyth

24

v. Kaufman (In re J.B. Koplik & Co.), 114 F.2d 40, 42-43 (2d Cir. 1940); Grubb v. Gen. Contract Purchase Corp., 94 F.2d 70, 72-73 (2d Cir. 1938) (L. Hand, J.). We have held that where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy. See Grubb, 94 F.2d at 73. However, we have been equally clear that where a new creditor provides funds to the debtor with no specific requirement as to their use, the funds do become part of the estate and any transfer of the funds out of the estate is potentially subject to trustee's avoidance powers. See Smyth, 114 F.2d at 42 (finding that transfer could be avoided where "nothing indicat[ed] that [the new creditor] loaned this $500 on condition that it should be applied to this particular creditor."). This result does not change even where the new creditor knows, but does not require, that the new loan funds will be used to pay off a preexisting debt. See id.

In this case, the bankruptcy court found that Flanagan's father provided the family loan for the specific purpose of paying the federal judgment. There was no doubt that the debtor's father made such funds available "for the sole purpose of purging Flanagan's contempt before Judge Covello through satisfaction of the underlying Judgment." This factual finding is not clearly erroneous and we accept it on this appeal.

25

The trustee does not seriously dispute that the family loan was made for the purpose of allowing Flanagan to pay the federal judgment. She insists, however, that the earmarking defense does not apply because Flanagan obtained possession of the funds temporarily. The fact that Flanagan temporarily had possession of the family loan funds does not necessarily demonstrate that Flanagan had control of them. The proper application of the earmarking doctrine depends not on whether the debtor temporarily obtains possession of new loan funds, but instead on whether the debtor is obligated to use those funds to pay an antecedent debt. See 5 Collier on Bankruptcy ¶ 547.03[2], at 547-24 ("The [earmarking] rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim . . . ."); see also Superior Stamp, 223 F.3d at 1009. Compare Grubb, 94 F.2d at 73 with Smyth, 114 F.2d at 42. Flanagan's receipt of the family loan funds was specifically conditioned upon his use of those funds to pay the federal judgment, and he never obtained control of the funds in the sense of being able to control how they were ultimately distributed. The earmarking doctrine therefore potentially applies to protect the Payment from avoidance.

There is, nonetheless, an important limitation on the earmarking doctrine. The doctrine will only protect a transfer from avoidance to the extent it did not diminish the debtor's

26

estate. Glinka, 97 F.3d at 28. Where a debtor replaces an unsecured obligation with a secured obligation, the payment is voidable to the extent of the collateral transferred by the debtor. Id. ("[T]o the extent that the debtor offered its own property as collateral for the [loan], the debtor transferred an interest in its property and therefore the earmarking defense is not available."); see also Mandross, 825 F.2d at 1071. In the case at hand, Flanagan satisfied the unsecured obligation of the federal judgment by taking on the secured obligation of the family loan. However, the bankruptcy court also found that the lien obtained by the debtor's father in the Thompson & Peck stock supplanted Babacas's lien in the stock. As a consequence, the bankruptcy court concluded the net diminution of the estate was equal to the difference between the Babacas loan ($85,000) and the Payment ($99,542.87), or the extent to which John Flanagan encumbered previously unencumbered property of the debtor estate to enable the Payment.

The trustee disputes the bankruptcy court's finding that the family loan lien supplanted, rather than merely subordinated, Babacas's lien. We believe the bankruptcy court's finding that the Babacas lien was supplanted by the family loan lien finds support in the record and is not clearly erroneous. Consequently, we conclude that the Payment can be avoided by the trustee, but only in the amount of $14,542.87.

27

## CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the district court is affirmed and appellees' motion to dismiss for lack of subject matter jurisdiction is denied.